The next case is Inversiones v. Del Monte. Brian Stack is here for the Appellant Del Monte. David Massey is here for the Appellee Inversiones. And when you're ready, Mr. Stack, you may begin. May it please the Court, Brian Stack on behalf of the Appellant Cross Appellee Del Monte International. Your Honors, I believe it's critical to recall and appreciate that the District Court below found INPROTSA to be in violation of the Anti-Sales Injunction from the very day that the arbitral award was entered all the way through a year and a half after the final judgment confirming the arbitral award. And at the teeth of that injunction, the evidence is undisputed below that INPROTSA received an ill-gotten gains, ill-gotten sales revenue more than $39 million. Can I ask you a quick question? Um, so insofar as the question before us is whether disgorgement is a proper remedy for contempt, right? I guess everybody agrees that I think, because the Supreme Court has said so, that contempt can do one of two things, coerce compliance or remediate loss, right? Um, so is the fact that the other side had ill-gotten gain sort of the appropriate measure, or should we be looking at whether you suffered out-of-pocket loss? Yes, that's a fair question. But this court and every circuit has addressed that issue, including the United States Supreme Court. The law generally is that the victimized party from contemptuous conduct either can prove up its own damages, or in the case of an injunction and contempt of a conjunction order, the loss or measure of damage or measure of relief is measured by the ill-gotten gains of the contemnor. But I guess the reason that it's sort of weird here, and you might tell me that I've just those two things don't necessarily match here, right? Because Del Monte gave the seeds, said either, like grow these things and either sell them back to us or destroy them, right? That is correct. And then there was a sale to third parties that netted some profit, but Del Monte's not really out anything, right? Because Improza could have just destroyed the pineapples. Well, Improza was under an obligation to destroy the pineapples or to return them all to Del Monte. They were precluded by two different injunctions from monetizing those pineapples. They were required to destroy or return all the plants to Del Monte or, and alternatively, they were precluded from selling them. Because wasn't Del Monte, when they would grow them, they would sell the pineapples to you? No, that is not true. At times they may have sold to Del Monte, but remember the contract was breached when it was terminated in 2013. At that time, the restrictive covenants of the pineapple sales agreement kicked in, which precluded any sales of pineapples and required the return of all the plants. I'm trying to figure out how Del Monte sustained a financial injury. Yeah, this is my question too. Right. Well, the district court found that Del Monte had sustained a financial injury. The magistrate judge in her initial report and recommendation, adopted in full by the district court, determined that Del Monte was injured by the loss of the benefit of its bargain, the enforcement of the restrictive covenant. So all your client lost was your exclusive control over the period of time that the illicit sales continued. That's the only thing you lost. No, they lost the ability to enforce the restrictive covenant, which became the injunction and the prohibition on in-process ability to do anything with those pineapples in the market. You want $40 million. How do you arrive at that figure? Because it's based upon a classic distortionment analysis as adopted by not only the United States Supreme Court in lieu, but by this court and by all the other circuits. Mr. Stack, let me ask you a question that with regards to the discouragement, is it you're, you're arguing kind of a entire undertaking exception. You want them to discourage everything, but shouldn't they have the ability to, to show that they had, since they did, they were running legitimate farm. There's no question about that. No, I don't agree with that, but I'll, I'll answer your honest question. They had expenses for land equipment and other things. Shouldn't they be able to subtract that number? Well, there are two issues on expenses and both articulated by this court in the Taiye case, post-lieu. This court adopting generally accepted principles of discouragement law said that the victimized parties only burden in a discouragement calculation is to show gross sales. We did that. We proved gross sales to the penny and it's not a dispute and proceeded that point over the district court. The issue becomes what are the expenses of in-prosa and who bears the burden to prove expenses. And under all the circuit court law, including the law of this court, the burden falls squarely on the contemnor to prove up what their expenses of sale were. The alternate, alternatively, equity, the obligation of the court is to return the status quo, right? And that's what the court did in this case. It just returned you to the status quo. The status quo did not include in-prosa keeping $39 million in sales that was prohibited from weren't entitled to that money. The only thing you were entitled to pursuant to the terms of the contract is to have those seeds returned or destroyed. That's what your contract provided, right? I'm not enforcing the contract post arbitral award. What we're enforcing is an injunction. So I think maybe I'm misunderstanding, but I think Judge Wilson and I are hung up on the same thing. Their ill-gotten gains in this weird relationship are not the same as some out-of-pocket loss of yours. Because in both Lew and Lespin, the wronged party had given money out and it was entitled to the return of that money. That's just like a different animal, right? We don't have that here. That is not here. But in other cases before this court, including the Tom James case, which is an injunction case, the Taiye case, which is an injunction case, the law is that the measure of the aggrieved party's losses are measured by the wrongful gain of the contendor. And that loss is equivalent to our loss. That is the measure of damages in a disgorgement case under Lew, under the restatement that years ago addressing restitutionary relief adopted. So let me ask you this. This is kind of like a first-year contracts kind of thing. You just mentioned restitution. Are disgorgement and restitution the exact same thing? No, they're not. Restitution, I would think, is the return of something you gave them, right? But disgorgement is something a little bit different. Ill-gotten gains, whatever, right? And that statement is an absolutely correct statement. It all comes right out of this court's holding in Guyana, which addresses the contours of restitution and disgorgement under section 51 of the restatement. And what this court said in Guyana is when product has been taken, either the aggrieved party is entitled to get that product back, those goods back, and if they've been sold, they're entitled to the sales revenue. That's the essence of disgorgement under Lew and under the restatement and under this court's holdings in Taiye and many other cases beforehand. But to Judge Wilson's status quo question, weirdly here, if you got the contempt award, wouldn't you be in a much better situation than you would have been sort of at the baseline? And we were. They could have, and you say should have, just destroyed all the pineapples. And we were in a better position because the arbitral award confirmed by the district court and adopted and embraced by the district court gave IMPROSA an option to return all the plant stock. And once they returned nearly all of it, 93 percent, then they had a right to continue to sell. But until such time, they had no right to do anything. So getting to the court's questions about status quo, the status quo is not in place here with the contempt or collecting in direct violation of a court order, an injunction, thirty nine million dollars. They're allowed to get the remedy that you were entitled to, which was the injunction itself. And you keep citing Lew. But Lew also says that the proper measure of damages is not to punish, but to compensate. And you got what you asked for. You got the injunction. But we didn't get what we asked for, Your Honor, because we received a piece of paper. You got what you were entitled to. We were entitled to more because. Within the discretion of the court. Let me ask you a question because it seems to me that you have an injunction. You received an arbitral award and you received an injunction. And really what happened is that they disregarded the injunction that was put in place and they violated the injunctive order. Correct? That is the finding of the district court from the moment that the arbitral award was entered up until a year and a half after the final judgment. And so really the question is, in essence, are you allowed to be compensated? Is your client allowed to be compensated for the violation of the injunctive award? That is the that is the overall essence of the appeal. And the answer, in our view, is absolutely yes. The notion that adopted by Lew, Lew did not break new ground. What Lew said was in a disgorgement situation, the award of disgorgement cannot rise to the level of punishment. It noted it did not change the law with respect to the burden of the contemnor to prove up its expenses. And even after Lew, this court said the contemnor has that burden, nor did it change the law that when the entire operation of the contemnor is wrongful, that no expenses ever get set off against gross sales. And in this case, the injunction prohibited Improza from doing anything with 93 percent of its plantation. It could not sell it. It could not give away those plant stock. It had an obligation either to give it back to us or destroy it. It didn't do any of that. Therefore, to argue that they were entitled to set off, which they've never proven any of those expenses, expenses of sale in connection with $39 million in revenues means that they are entitled to essentially operate an illegal plantation and then make money, pay their expenses with ill-gotten gains. And that's what Lew and this court in Taiye said is not permitted. The status quo has not been preserved in this case. To the contrary, Improza says we can violate this injunction because all you're entitled to is this piece of paper and we can keep $39 million in sales. Sounds like you should have put together a better contract to begin with. But Your Honor, I think that you respectfully, the contract is not at issue here. The contract merged into the arbitral award. The arbitral award was subsumed in the final judgment. And what the final judgment included was an injunction. And the injunction prohibited sales. If the court were to conclude that there is no consequence to Del Monte because all it got was an injunction and there are no consequences to Improza for making sales that generated $40 million in revenue, then that injunction is meaningless. It effectively negates the arbitral award. It nullifies the injunction. And it leaves Del Monte victimized and the contemnor enriched, unduly so, to the tune of nearly $40 million. And that error of the district court in not putting the burden on Improza either to prove up what its expenses were or to consider that actually none of those expenses were legitimate within the meaning of lieu and the restatement, unduly enriched Improza. There are other errors in the district court's holding. Mr. Stack, you've reserved some time for rebuttal. Thank you, sir. Thank you. And Mr. Massey? Good morning, Your Honors. David Massey for Apelli Inversiones, the Processadora Tropical Improza S.A., short for Improza. Let me start with the disgorgement issue. There's one, I'll pick up on one question you asked. Why not Del Monte's actual damages? That's an appropriate remedy. They could have elected. They have refused. Let me ask you a question. Your client had, there was an arbitral award that was made and there was an injunction that was placed on your client. That's accurate?  So is it your position that Del Monte has no recourse for violations of an injunction? No, Your Honor, we're not. We didn't even appeal the contempt finding. The district court made whatever decision it made, assigned a sanctions award. We never appealed it. And I think this dovetails to what you were going to say. Improza fought vigorously to get Del Monte's financial records so we could do a lost profits analysis. But Del Monte, from the very beginning, would only yield to gross revenues. We argued for our own net profits. They rejected it. We sought financial records so that we could do our own lost profits analysis of their records. And they fought it and we lost that in the district court. And there's an order saying that because essentially Del Monte has elected a remedy, for better or worse, we were not entitled to conduct our own lost profits analysis because Del Monte was not electing their own actual losses as a sanctions remedy. So Del Monte has been with gross revenues from the very beginning. Now, Lew is such an important case because it wasn't a revolutionary discovery. Lew went back into 150 years of equity jurisprudence and redefined the contours, or maybe just clarify the contours, and said that a sanctions award cannot be punitive. It can only be compensatory. And the way that you get to that is you calculate someone's gross revenues. You deduct the cost of goods sold to get to gross profits. You then deduct business expenses to get to net profits. And that is an appropriate sanctions remedy that is not punitive. So let me ask you this, though. Before we even get to the whole Lew, gross revenues, net profits thing, don't we have to decide as like a threshold matter whether Del Monte has out-of-pocket losses? I guess I'm sort of hung up on this idea that given what the Supreme Court has said about the purpose of contempt sanctions, either coerce, compliance, or remediate injury, that before we start talking about what was proved or not proved on sort of the other side of the feed, on your side of the feed, so to speak, about sort of what your gross revenues were and your net profits were, we need to figure out what, if any, their out-of-pocket losses were. Is that right? I would agree with that, except probably in this case we have a waiver issue because Del Monte refused to calculate it and then refused to produce evidence that would allow us to calculate it. And the docket entry for that is 244, which is an order denying our motion to compel Del Monte's financial records in order to conduct a lost profits analysis of Del Monte. So yes, it would have been an appropriate remedy, but because Del Monte refused to do it themselves and refused to allow us to do it, there's a waiver issue there. Now, stepping forward to lieu, net profits of Improza would be a potentially adequate remedy. The reason that Del Monte did not want to use it is because the undisputed evidence in the case is that Improza had no net profits. It operated at a loss. I guess what I'm asking is, in a case like lieu, that makes some sense to me, where in lieu, as I recall, I don't recall specifically the facts, but in lieu, the wronged party, so to speak, had given the wrongdoer money and wanted it back. It was a traditional restitutionary remedy, whereas here, given the weird nature of the contract, that's just not what we really have. And so the way I think about it, I'm not even really sure we get to this funky lieu analysis about gross revenues and net profits if, in fact, there is no out-of-pocket loss on the other side of the beak. Well, Judge, you're peeling back the layers of the onion, and you're reverse engineering why Del Monte was so adamant about sticking with gross revenues, even though it is contrary to the law. Every case that Del Monte cites that's actually a sanctions award case, even pre-lieu, uses net profits as the measure. And that's why the Supreme Court, in lieu, when they went back and surveyed all of that case law, said, yes, net profits is correct. That's what everybody's been using the whole time. Now, Del Monte probably could not have demonstrated actual loss for the reasons that your honors are pointing out. And so they shifted to IMPROZA, focused on IMPROZA. And what the undisputed evidence, and I'll give you some more information in a moment, was that IMPROZA had no net profits because it had been operating at a loss during the entire period. They were stuck at gross revenues. Now, I don't know what was in Del Monte's mind. They either went for the highest number or they went for the only number out there. But let me say something about the burden, because I vigorously disagree about the description of the burden. As Judge Moreno said, the burden is on Del Monte. He said it on page 11 of his August 10, 2021 order. And then on pages 11 through 14, he went through an analysis and he explained why Del Monte had not met his burden. And the burden is to provide a reasonable approximation of a sanctions award. And he said there is no case law that says that gross revenues is a reasonable approximation. And therefore, there is no evidence that the court can rely on to fashion a sanctions award because, of course, the court can't pull it out of thin air. The court has to rely on the evidence provided by the parties. And the court found that because gross revenues is not a reasonable approximation, there was nothing to award. Now, this does go to burden shifting because Judge Moreno was very clear that Del Monte had the burden. And he cited the Inouye Chase and Sanborn case on page 11 before he went through his analysis and said Del Monte had not met his burden. But even if you look at 11th Circuit post-lieu cases, and my colleague mentioned CFTC versus TAE, it's very specific about what it says. It says the party seeking sanctions has the burden to make a reasonable approximation. And that means a reasonable approximation that is consistent with the law. And post-lieu, as CFTC versus TAE was very clear, that means net profits. And if the contemnor disagrees with that, then the contemnor has an opportunity because the burden shifts. But the burden never shifts unless there's a reasonable approximation. And what Judge Moreno found was that gross revenues is not a reasonable approximation. And whether you call that strategy, the calcitrant, a lack of options, that's what happened. And it was not a reasonable approximation and the burden never shifted. Now, if the burden had shifted and it didn't, Mr. Greer was subjected to two days of testimony under oath. And he testified that there were no net profits. And then IMPROTSA produced all its financial records, general ledgers, balance sheets, planting records, go down the line. And then we answered over 50 interlocutories under oath, responded to 100 requests for production documents, produced over 60,000 documents. And all of that confirmed. So I'm confused now. Your client did not stop producing this variety of pineapple, right? And it didn't destroy or return the remaining vegetation to Del Monte, which it was required to do under the contract. It kept producing the pineapples and made a bunch of money, right? Not exactly, Your Honor. The pineapples that are even planted and Del Monte harvested them and destroyed the plant material as it went until it was all gone. That took until a period of months after the final judgment. But the process, because there was, I can't remember the exact number, but something like 70 million pineapple plants and restrictions under Costa Rican law about how plant material can be destroyed. The process was to harvest, destroy, harvest, destroy, harvest, destroy until it was all gone. And that did take for a period of months until after the final judgment. And that's the basis of contempt order. And we never appealed it. Do you want to address the contempt order against the individuals? Yes, Your Honor, I would. Obviously, we disagree with that. There's a number of reasons why. Let me ask you one quick question before you get going. If we were to conclude that disgorgement weren't a proper remedy here, what's the practical effect of the contempt sanction against the areas? Like, does it matter? The practical effect is that there are no more pineapple plants in Costa Rica on this farm that are being farmed by Enproza with the MD2 pineapple seed. I mean, I don't know what else. I mean, I guess the question is, like, did the Gurias care that they've now been held in contempt? But there's no real hint to that adjudication, if you will. Judge, I don't know if it keeps them up at night. It is what it is. And, you know, like I said, the contempt order is what it is and it covers what it covers. This is really a personal jurisdiction argument because, you know, Del Monte never made the Grias a party to the district court confirmation proceeding. Are the Grias parties to this appeal? No, Your Honor. They're not. They're not parties to the appeal. Do we even need to even get to that issue of jurisdiction over the Grias? Probably not, Your Honor. I think I would sum it up by just saying this, you know, it's very intuitive for any federal court judge to know that if someone aids and abets something that would result in contempt, they get drawn in and they're subject to the court's jurisdiction. The reason for that is because in almost every situation, the officers who guide the conduct are in the United States. Federal injunctions run nationwide, and so they sweep in everyone in the United States. But federal injunctions do not run worldwide. And so to assert contempt against an aider and abetter who is a foreign national, it requires personal jurisdiction. So let me just make sure I've got this straight, though. What's the magic of the domestic versus foreign line for personal jurisdiction purposes? Why wouldn't we need to do a personal jurisdiction analysis even in the ordinary Rule 65? For instance, like out-of-state lawyers, we've got jurisdiction over them or whatever. The doctrine is that federal injunctions run nationwide, and because they run nationwide, they automatically sweep in anyone from Maine or Portland or wherever, even if the court's in Miami. But that analysis does not work when you're talking about worldwide because federal injunctions do not run worldwide. You say that this may be like the dumbest question of all time, but when you say that the doctrine is that federal injunctions run nationwide, does that mean the doctrine is that federal injunctions run nationwide without respect for personal jurisdiction? They run nationwide and create personal jurisdiction. So those two things necessarily, you're saying, happen simultaneously? Yes, Your Honor. And so with respect to foreigners, does that mean, for instance, that if there's an injunction entered here in the U.S. that a company's foreign lawyer in Brussels or whatever can divulge trade secrets in violation of the injunction and that there's no recourse against that? No, not necessarily, Your Honor. There are ways to create personal jurisdiction. These gentlemen are foreign nationals who are Mexican citizens. They could have been served. Mexico is a hate convention country, and whatever defenses might have been asserted to that, people get served internationally all the time. By the same token, a federal court could assert its own personal jurisdiction to respond to if it could meet certain requirements. In this case, it would require Florida's long-arm statute. So these foreign nationals would have to have some sort of business connection to Florida that falls within the scope of the long-arm statute. And then the due process analysis would have to be met, which, of course, as you know, is a showing of sufficient minimum contacts with the forum, and that exercising a jurisdiction would not offend traditional notions of fair play and substantial justice. So that would be a proper exercise of personal jurisdiction. None of that exists. And I think one of the most important things here is that the burden is on the party asserting personal jurisdiction to make a prima facie showing. This is obviously kind of a weird case. We say there's no personal jurisdiction. Del Monte has not asserted personal jurisdiction. So we have a situation where nobody's asserting personal jurisdiction, and that in and of itself kind of ends the analysis. But that's kind of where we're at on that issue. I've got about 60 seconds left, Your Honor. So one of the issues is the request for the injunction to go backwards in time. That was denied by the district court. The district court just didn't believe they could enter a final judgment and project it backwards in time to the date of the final award. But they found that Del Monte didn't sign any cases on that. We didn't find any cases. District court didn't find any cases. So the district court just kind of said, we can't do that. This court issued a jurisdictional question on that same point on October 1st, 2021. And the question was, well, if Judge Moreno denied that request in 2019 and you didn't appeal it until 2021, what gives? And the law very briefly is that in pre-final judgment cases, all the interim orders that may arise are subsumed to the final judgment. And those are the cases that Del Monte cited. The better cases are the post-judgment cases where the 11th Circuit essentially says, you know, post-judgment litigation can sort of stop and go. And so the items are more freestanding. So once they're disposed of and finally disposed of, that's it and they're appealable. In this case, Judge Moreno said in 2019, you can't project contempt relief backwards in time, so that's it. And that stood for years until Del Monte appealed it. Now, we know that it wasn't contingent upon the sanctions award because sanctions are no sanctions. That was never a proper remedy. And so in answer to the jurisdictional question, we think it was an untimely appeal. And with that, Your Honor, I'll just remind you that there's a motion for limited remand, which is a separate issue. It's been carried with the case by order of this court. And thank you very much. Thank you. Mr. Massey, we'll hear from Mr. Stack again. I'd like to address your question, Judge Newsom, on whether, before disgorgement can be considered, Del Monte had to prove some pecuniary loss on its own. This court answered that question in the negative in Howard Johnson v. Del Monte, citing the United States Supreme Court case in Lehman. And I quote from Howard Johnson, quote, the Supreme Court in Lehman, Lehman v. Krentzler-Arnold, has held that a contender's profits may be included as part of compensatory relief despite the absence of showing pecuniary loss. And Lehman, which is the Supreme Court case dealing with the right to disgorgement in by full violations of injunction, that's where the Supreme Court said a contender's profits are, quote, an equivalent or a substitute for legal damages when the victim's damages have not been shown and are recoverable, not by way of punishment, but to ensure full compensation. So the issue here is not, did Del Monte establish a dollar's worth of lost profits on its own? The issue here is, did we establish compensable relief by showing disgorgement? And all of the cases that we've cited in our brief hold for that proposition. With regard to the burden, there was no evidence in the record put in by Imfroza as to any of its expenses. The only evidence in the record were the gross sales. And as I indicated in my preliminary argument, Del Monte's only burden was to show gross sales. We've cited the Klein-Becker case. We've cited the Roth-Howard case out of the Tenth Circuit. And I've also cited the Talia case. And what those cases hold, particularly, the clearest statement is out of the Tenth Circuit. Quote, to assist the court in arriving at the appropriate award for disgorgement of only. While the defendant has the burden of proving all elements of cost or deduction, stated differently by the Tenth Circuit later on, the plaintiff has the burden of showing gross receipts, while the defendant has the burden of proving any kind of deduction. And this court in Talia, plaintiff has the burden to produce a reasonable approximation of defendant's ill-gotten gains to sustain a disgorgement amount. Once the plaintiff meets this burden, the burden then shifts to the defendant to demonstrate that the estimate is not a reasonable approximation. So the issue here is, is Del Monte left without compensation? Or is Improza entitled to keep $39 million when it admits it violated the injunction from the moment that the arbitral award was entered? The court found that that violation occurred and was not denied by Improza. And under the Eleventh Circuit law and Supreme Court law, once we are able to establish that we have been harmed and the district court found that we had been harmed, we are entitled to disgorgement. I might point out, in the underlying appeal, which confirmed the arbitral award, the very same issue of disgorgement was raised. There, this court affirmed the disgorgement award, which was set forth in the final judgment, incorporating and confirming the arbitral award. Why? Because Improza never proffered any evidence of its expenses. So the award by the arbitral panel for violation of the restrictive covenant was disgorgement. And the reason it ordered disgorgement, as set forth in the arbitral award, of gross sales was because Improza never proffered its expenses. And that issue was repeated on appeal. But can I ask you one quick question? I should remember this from the briefing, but will you give me the citation of this Lehman case? Yes. It's Lehman v. Krentzler, K-R-E-N-T-L-E-R, 284 U.S. 448. It's an oldie but a goodie, I guess. Well, it's an oldie but a goodie because it's repeated and cited by this court in the other disgorgement cases because— Just so I'm clear, though, what about—am I misreading or misunderstanding? There's this subsequent case, a 1947 case called the United States v. United Mine Workers in North America that says that a content sanction must, of course, be based upon evidence of the complainant's actual loss. Is that contrary to Lehman? It—all that those line of cases—this court in Chase and Sandburg also said the plaintiff had to establish an injury. But where the law has evolved and developed over time, it started with Lehman and it continues throughout all the cases. The Second Circuit in the Manhattan Industries case has a very clear articulation of what that means. And it says that in order to unlock the verdict of disgorgement, the plaintiff has to show that it suffered some injury and its injury is measured by the ill-gotten gains of the contendor. When United Mine Workers says must be based upon the evidence of complainant's actual loss, what does it mean? It means that there must be evidence of some form of loss, either in the form of lost profits of the victimized party or in the form of disgorgement as measured by the ill-gotten gains of the contendor. And that's precisely what Lehman held. Lehman addressed that very issue the year after the United Mine Workers case. And the court in Lehman said—reversing the circuit or district court, I can't recall which—saying that's not the standard. The keys to unlock that door to disgorgement are based upon whether or not you can establish disgorgement relief. So I think once one appreciates that Del Monte's right to get disgorgement was based upon well-established law from the United States Supreme Court and this court and every other circuit—we've cited multiple cases in our briefs—we're entitled to that disgorgement. One 10-second word on this cross-appeal. The Gurias haven't filed a brief in this court, yet they're asking this court to reverse the contempt citation when they haven't asked for relief in this court. They never asked for relief in the district court. The only time they ever uttered the words personal jurisdiction were at the last hearing, and they never moved for dismissal. So it's totally inappropriate at this late hour for the Gurias to ask for any form of affirmative relief. Thank you, Mr. Stack. Thank you. Thank you. Thank you.